UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS,<br><br>               Plaintiff,<br><br>    v.<br><br>VFORCE INC., et al.,<br><br>               Defendants. | No.  2:18-cv-02066-DAD-CKD<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT<br><br>(Doc. No. 92) |
| VFORCE INC.,<br><br>               Cross-Claimant and<br>               Third-Party Plaintiff,<br><br>    v.<br><br>CORTECH, LLC, et al.,<br><br>               Cross-Defendant and<br>               Third-Party Defendants. | |

        This matter is before the court on the motion for summary judgment, or in the alternative,

partial summary judgment filed by plaintiff on March 2, 2021.  (Doc. No. 92.)  The pending

/////

/////

/////

1

motion was taken under submission by the previously assigned district judge on May 17, 2021.[1]
(Doc. No. 103.)  For the reasons explained below, plaintiff's motion will be granted in part and
denied in part.

**BACKGROUND**

This case arises from defendant VForce Inc. ("VForce"), a staffing company, allegedly
failing to pay the additional insurance premium owed to plaintiff Zurich American Insurance
Company of Illinois ("Zurich") in breach of their workers' compensation insurance contract.

**A.     Background on Workers' Compensation Insurance Policies and Premiums[2]**

In California, workers' compensation insurance is heavily regulated by the California
Insurance Code, the Insurance Commissioner, and the Department of Insurance.  *See State Comp.
Ins. Fund v. ReadyLink Healthcare, Inc.*, 50 Cal. App. 5th 422, 431 (2020).  The Insurance
Commissioner and the Workers' Compensation Insurance Rating Bureau ("WCIRB") have
statutory authority "to oversee the form and substance of all workers' compensation insurance
plans, including everything from the scope of required coverage provided to employees, to the
amount employers pay insurers for premiums."  *Ceradyne, Inc. v. Argonaut Ins. Co.*,
No. G039873, 2009 WL 1526071, at *1 (Cal. Ct. App. June 2, 2009).  As one district court aptly
summarized:

> Workers compensation insurance premiums are calculated in part by
> determining the amount of payroll associated with a given "class
> code."  The class code refers to the classification of employees based
> on their job duties and descriptions for the purpose of determining
> the workers compensation insurance rates.  In California, the
> Department of Insurance approves the rates charged by an insurance
> carrier for a given class code and class code rates not so approved
> cannot be charged by an insurance carrier.  In general, the higher the
> risk of injury posed by a certain job type, the higher the rate charged

---

[1]  On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 132.)  The
undersigned has endeavored to work through a backlog of inherited submitted motions in civil
cases as quickly as possible since returning to the Sacramento courthouse.

[2]  Though not stated as facts in the parties' separate statements of undisputed facts, plaintiff
Zurich and defendant VForce each provide additional context regarding workers' compensation
insurance policies and premiums in their briefs.  (Doc. Nos. 92-1 at 6–7; 102 at 6–7.)  That
context, which is largely derived from the affidavits that the parties filed in support of their
respective briefs, is summarized first in this background section.

1
2
3
4

> per each $100 of payroll.  Prior to the issuance of an insurance policy, an insurance proposal is provided to the prospective insured for approval.  This insurance proposal (otherwise known as a "quote") includes all the rates, schedules, credits, debits[,] and modifiers used to calculate the insurance premium for a policy and is incorporated into the policy[] once the insured agrees to accept the quote and bind the policy to the quoted rates.

5   *Zurich Am. Ins. Co. v. UGS Priv. Sec., Inc.*, No. 22-cv-01163-GW-EX, 2023 WL 3565063, at *1

6   (C.D. Cal. Jan. 20, 2023).  The policy terms change when an endorsement to the policy is issued,

7   which frequently happens after the inception of the policy and often happens after the end of the

8   policy period as well.  (Doc. No. 92-4 at 3.)  For example, staffing agencies that supply temporary

9   workers to clients in various industries have many different class codes applicable to their

10  workers' compensation policies.  (*Id.*)  Such agencies often obtain new clients during the policy

11  period who need temporary workers in class codes not already included in the policy (i.e.,

12  employees with different job duties).  (Doc. No. 92-7 at 6.)  Thus, the applicable class codes often

13  change during the policy year when the staffing agency needs to add class codes for those job

14  duties.  (Doc. No. 92-4 at 3.)  When a temporary staffing agency notifies the insurance carrier of

15  the new class codes, an endorsement to the policy for that class is generally issued.  (*Id.*)

16  In addition to class codes, another component of the premium calculation is the insured's

17  experience modification rating (sometimes referred to as an "ex mod"), which is determined by

18  the WCIRB based on its analysis of claims data.  *Allied Interstate, Inc. v. Sessions Payroll Mgmt.,*

19  *Inc.*, 203 Cal. App. 4th 808, 819 (2012) ("It is well settled that the experience of a particular

20  insured may be used as a factor in setting the premium.") (citation omitted).  An ex mod of less

21  than 1.00 is a multiplier that decreases the overall policy premium (after adding up payroll

22  associated with each class code and applying other debits and credits), whereas an ex mod of

23  more than 1.00 is a multiplier that increases the premium.  (Doc. No. 92-4 at 4.)

24  Insurance carriers cannot discount or deviate from the experience modification rating set

25  by the WCIRB.  (Doc. No. 92-7 at 4.)  The WCIRB can change the experience modification

26  rating for an insured multiple times within a year, for example, due to updates in payroll or claims

27  information, and the WCIRB notifies the insured of such a change when it is made.  (*Id.* at 5.)

28  The WCIRB requires carriers, once they become aware of the ex mod change, to issue a policy

1  endorsement to include the rating change as part of the insurance policy and premium calculation.

2  (*Id.*)  Such endorsements may even be issued after the policy period has ended if the carrier learns

3  after that end date of an ex mod change with an effective date during the policy period.  (*Id.*)

4  Typically, an insurance carrier learns of an ex mod change either by monitoring the WCIRB

5  database,[3] by receiving change information from the insured's broker, or by receiving a "criticism

6  letter" from the WCIRB alerting the carrier of its failure to notify the WCIRB that an

7  endorsement to the policy reflecting the ex mod change has been issued, as required.  (*Id.*)

8  **B.      Factual Background[4]**

9        1.      <u>The VForce Policy</u>

10        In the summer of 2014, VForce's insurance broker, Charles "Adam" Forbes, approached

11  Zurich's managing general agent, World Wide Specialty Programs ("World Wide"), to obtain

12  workers' compensation insurance for VForce.  (PUF ¶ 1.)  A workers' compensation insurance

13  proposal was issued by World Wide on behalf of Zurich to VForce on September 26, 2014 for the

14  proposal period December 15, 2014 to December 15, 2015.  (PUF ¶ 2.)  That proposal was

15  accepted by VForce, and Zurich workers' compensation policy No. WC 5714367-00 was issued

16  to VForce for the policy period December 15, 2014 to December 15, 2015 ("the Policy").  (PUF

17  ¶ 3.)

18        By its own terms, the Policy consists of the policy and all of its endorsements.[5]  (PUF ¶

19  4.)  The Policy states that "[t]he only agreements relating to this insurance are stated in this

20  policy.  The terms of this policy may not be changed or waived except by endorsement issued by

21
22  [3]  The WCIRB has a record of ex mod ratings for each workers compensation insurance insured called a Workers' Compensation Experience Rating Form.  (Doc. No. 92-7 at 5.)

23
24  [4]  The relevant facts that follow are undisputed unless otherwise noted and are derived from the undisputed facts as stated by plaintiff and responded to by defendant VForce (Doc. No. 102-1 ("PUF")), the additional material facts as stated by defendant VForce and responded to by
25  plaintiff (Doc. No. 104-1 ("DUF")), as well as the exhibits attached to the affidavits filed by the parties in support of their respective briefs (Doc. Nos. 92-3–92-9, 102-4, 102-5, 104-2–104-5).

26
27  [5]  VForce does not dispute that the endorsements are part of the Policy but argues that the endorsements are illegal, void, and unenforceable under the California Insurance Code.  (PUF ¶ 4.)  Defendant's arguments in this regard will be addressed in the analysis section of this order
28  below.

1   us to be part of this policy." (PUF ¶ 22.) The Policy provides that "this policy, including all

2   endorsements forming a part thereof, constitutes the entire contract of insurance. No condition,

3   provision, agreement, or understanding not set forth in this policy or such endorsements shall

4   effect such contract or any rights, duties, or privileges arising therefrom." (PUF ¶ 21.)

5       Every single time there is a change to a workers' compensation policy, an endorsement

6   must be filed with the WCIRB.[6]  (DUF ¶ 1.) During the policy period, many new class codes

7   were incorporated into the Policy by endorsements. (PUF ¶ 11.) During the VForce Policy

8   period, the WCIRB changed VForce's experience modification rating twice, and the two changes

9   were incorporated into the Policy by endorsements. (PUF ¶ 12.) Zurich is required by the

10  WCIRB to charge the experience modification rating changes as a policy premium multiplier.

11  (PUF ¶ 20.) The Policy provides that Zurich has the right at the time of the post-policy period

12  payroll audit to apply all rates and classifications that lawfully apply for purposes of calculating

13  the final premium. (PUF ¶ 23.)

14      Immediately before or after the inception of the VForce Policy in December 2014,

15  VForce's insurance broker (Mr. Forbes) contacted Zurich's managing general agent (World

16  Wide) and requested that Accuire, LLC ("Accuire"), another staffing company owned by VForce,

17  /////

18  /////

19  /////

20  /////

21

22  _____

    [6] Defendant offers as an undisputed fact that plaintiff did not file the Policy endorsements with
    the WCIRB, but the evidence defendant cites does not support this purported fact. (DUF ¶ 2.)

23  Defendant cites the deposition testimony of Robert Thompson, president of World Wide, who
    stated that Zurich—not World Wide—submits endorsements to the WCIRB and that he was sure

24  that Zurich had done so with the Policy endorsements. (Doc. No. 102-4 at 73, 80.) Thompson
    did not testify that the endorsements were not submitted *at all* to the WCIRB. As for plaintiff's

25  evidentiary support for its assertion that it did in fact submit all Policy endorsements to the
    WCIRB as required, plaintiff cites to the affidavits of James Buck (Zurich's programs

26  underwriter), Carol McArdle (Zurich's statistical analyst), and Margarita Hambrock (World
    Wide's underwriting supervisor), all of whom state that pursuant to Zurich's policy writing

27  system, all 26 endorsements to the Policy were filed via direct uploading to the WCIRB within a
    day of being written. (DUF ¶ 2; Doc. Nos. 104-2 at ¶ 8; 104-3 at ¶¶ 2–3; 104-4 at ¶¶ 3–4.)

28

                                              5

1  be added as an additional insured to the VForce Policy.[7]  (PUF ¶ 9.)  On December 22, 2014, one

2  hundred percent of the membership interest in Accuire was transferred to VForce pursuant to an

3  agreement dated December 22, 2014.  (DUF ¶ 24.)  Despite VForce's request to add Accuire as

4  an additional insured on its Policy, during a phone call immediately before or after the December

5  15, 2014 inception of the VForce Policy, Mr. Forbes informed Mr. Thompson (World Wide's

6  president) that VForce and Accuire planned to separate, with different ownership groups, and that

7  it was VForce's and Accuire's desire that a separate workers compensation policy be issued to

8  Accuire after the split.  (DUF ¶ 28; Doc. No. 92-5 at ¶ 19.)

9          According to Zurich, a policy endorsement with an effective date of December 30, 2014

10  was issued adding Accuire as an additional insured to the VForce Policy ("Endorsement No. 3").

11  (PUF ¶ 10; Doc. No. 92-3 at 68.)  VForce does not contest that Endorsement No. 3 added Accuire

12  as an "entity name," but VForce disputes the characterization that Accuire was added as an

13  "additional insured."  (PUF ¶ 10; DUF ¶¶ 5, 6.)  The "change description" on Endorsement No. 3

14  states:

15          THE FOLLOWING DBA NAME HAS BEEN ADDED TO LEGAL
            ENTITY:  ACCUIRE, LLC:  VFORCE STAFFING SOLUTIONS
16
17          THE FOLLOWING ENTITY NAME(S) HAVE BEEN ADDED:
            ACCUIRE, LLC

18  (Doc. No. 92-3 at 68.)  It is undisputed that the Schedule of Insureds and Locations provision of

19  the VForce Policy lists VForce, Inc., not Accuire, LLC.  (DUF ¶ 4.)  According to VForce, an

20  additional insured would have been listed in the schedule of named insureds.  (DUF ¶ 3.)  But the

21  _____

22  [7] While not listed as undisputed facts, VForce provides additional factual context with regard to
    VForce and Accuire, primarily citing to the affidavit of Mark Nobili, a founding partner,
23  shareholder, and vice president of VForce.  (Doc. No. 102 at 7) (citing Doc. No. 102-5 at 1–2).
    For context purposes, the court notes that according to VForce: (i) VForce is a service-disabled
24  veteran-owned California corporation, that operates a small staffing and employment service
    business specialized in government contracting; (ii) VForce serves a narrow subset of customers
25  including clerical, administration, and wholesale/warehouse customers that seek to provide
    veterans with positions in the work force; and (iii) at all pertinent times, VForce had less than $2
26  million dollars in payroll.  (Id.)  In contrast, Accuire, is a large and diverse staffing company and
    professional employer organization ("PEO") that provides a wide range of clients with staffing,
27  payroll, workers' compensation, and human resources services and at all pertinent times had over
    $20 million in payroll.  (Id.)
28

6

1   only supporting evidence VForce has cited for this assertion is an excerpt from the deposition

2   testimony of Christopher Hawkins, Zurich's premium audit director, who was asked "where on

3   the policy is the additional insured listed?"  (Doc. No. 102-4 at 28.)  He answered:  "There is an

4   additional insureds or a named insureds endorsement on the policy.  So, *without reviewing the*

5   *policy in front of me*, that's where it would have been identified, within the named insured's

6   schedule or the schedule of named insured's endorsement."  (*Id.*) (emphasis added).  According to

7   plaintiff and based on the affidavit of Mr. Buck (Zurich's programs underwriter), "Accuire is not

8   in the 'Schedule of Insureds and Locations,' which is created at the inception of the VForce

9   Policy, because Accuire was added as an additional named insured by Endorsement No. 3 after

10  policy inception, and new Schedules are not generated after inception of the policy."  (Doc. No.

11  104 at 6) (citing Doc. No. 104-2 at ¶ 16 ("If endorsements are added to the policy after inception

12  (as in this case, including the addition of Accuire as an insured) new Schedules are not created.

13  The added endorsements are deemed part of the policy by its terms.")).[8]

14          Pursuant to the Policy, Zurich provided workers' compensation insurance to VForce and

15  other listed insureds during the policy period.[9]  (PUF ¶ 5.)  The Zurich claims handling and intake

16  forms for new workers' compensation claims are tied to the policy number.  (PUF ¶ 27.)

17  _____

18  [8]  To support its asserted fact that Accuire was not named on the VForce Policy, defendant also
    points to two "criticism letters" that Zurich received from the WCIRB, the first dated September

19  14, 2015, and the follow-up letter dated October 14, 2015, regarding a "Policy Audit Error
    Query."  (DUF ¶ 7; Doc. No. 102-4 at 97–100.)  The letters explained that "[t]he WCIRB's audit

20  of the referenced policy detected the following data condition(s) in need of immediate correction
    or clarification:  [t]he following name(s) was not on prior coverage for this policyholder (ID01):

21  Acquire, LLC," and the WCIRB asked Zurich to provide "prior coverage information" for
    Accuire.  (*Id.*)  Plaintiff disputes defendant's interpretation of these letters as indicating that

22  Accuire was not named on the VForce policy.  (DUF ¶ 7.)  To the contrary, plaintiff relies on Mr.
    Buck's affidavit, in which he explained that "there is no evidence that the WCIRB ever

23  challenged or rejected the addition of Accuire as an additional insured to the VForce Policy," and
    these letters "request information about Accuire's past policy history, given that Accuire was not

24  previously on VForce's workers compensation coverage as a combinable entity."  (*Id.*; Doc. No.
    104-2 at ¶¶ 11–13.)

25

26  [9]  Defendant purports to dispute this fact "to the extent that 'VForce, Inc.' is the only properly

27  named insured on the Policy."  (PUF ¶ 5.)  However, regardless of whether the "other listed
    insureds" were properly named or not (in defendant's view), defendant does not dispute that

28  Zurich provided insurance to VForce *and Accuire* during the policy period.  (*Id.*)

2.      The Accuire Policy

VForce's insurance broker, Mr. Forbes, notified World Wide in April 2015 that Accuire was in the process of splitting away from VForce and requested World Wide to start the process of separating their workers' compensation policies.  (DUF ¶ 29.)

On May 1, 2015, Accuire and VForce entered into an agreement wherein VForce assigned all of its rights, title, and interests in Accuire to Gardner Investments Holdings, LLC, and Mani Kontokanis (who continued to serve as VForce's president/CEO).  (DUF ¶¶ 19, 25.)  On or about May 26, 2015, Mike DiManno resigned as vice president and director of VForce and transferred his share of VForce to Mr. Nobili (founder, shareholder, and vice president of VForce).  (DUF ¶ 26.)

On September 16, 2015, a proposal for a separate workers' compensation policy for Accuire was issued by World Wide on behalf of Zurich.  (PUF ¶ 26.)  That same day, Mr. Forbes emailed World Wide to confirm Accuire's acceptance of the Accuire proposal, and Zurich issued the workers compensation policy No. WC 5714432-00 to Accuire for the policy period October 1, 2015 to December 15, 2015 ("the Accuire Policy").  (Doc. No. 92-4 at ¶ 26.)  Effective with the issuance of the Accuire Policy, World Wide issued Endorsement No. 23 on the VForce Policy to remove Accuire from the VForce Policy.  (DUF ¶ 30; Doc. No. 92-4 at ¶ 27.)

World Wide had been informed of the ownership change between Accuire and VForce before September/October 2015.  (DUF ¶ 27.)  However, Accuire did not provide all of the information and documentation needed by World Wide and Zurich to assess the risk and make an underwriting decision about whether to issue a policy proposal for a separate workers' compensation policy to Accuire until mid-September 2015.[10]  (PUF ¶ 25.)

3.      The Audit of the VForce Policy

Pursuant to the VForce Policy, the initial deposit is an estimate ("deposit premium") based on the insured's estimate of its payroll and allocation of that payroll to pertinent class codes.

---

[10]  Defendant purports to dispute the fact that Accuire had not provided Zurich with the necessary information by asserting that, (at some unspecified time) before September 2015, *VForce* provided all the information necessary for Zurich to remove Accuire from the Policy.  (PUF ¶ 25.)  However, none of the supporting evidence cited by defendant substantiates this assertion.

(PUF ¶ 6.)  Pursuant to the Policy, Zurich performed a payroll audit of VForce after the policy term, which functioned as a "true-up" to determine any difference between the estimated and actual payroll and allocation to class codes.  (PUF ¶ 7.)  That is, if the payroll audit determined that VForce's actual payroll as allocated to pertinent class codes for the policy period is higher than its estimated payroll as allocated to pertinent class codes for the policy period (after application of applicable rates, credits, debits, discounts, and multipliers), then an additional premium would be owed by VForce to Zurich.  (PUF ¶ 8.)  On the other hand, if the actual payroll/class code equation is less than the estimated payroll/class code equation, then VForce would have been entitled to a premium rebate.  (*Id.*)  The Policy provides that "[t]he due date for audit and retrospective premiums is the date of the billing."  (PUF ¶ 15.)

A payroll audit was conducted by Zurich after the end of the VForce Policy.  (PUF ¶ 13.) Specifically, beginning in January 2016, Mr. Hawkins, Zurich's premium audit director, simultaneously conducted the post-policy payroll audits for the Zurich workers compensation policies for VForce and Accuire.  (*Id.*; DUF ¶ 10; Doc. No. 92-6 at ¶ 12.)  When auditing a policy with more than one named insured, the auditor must verify payroll to each specific entity, which requires the insurer to segregate the payroll between entities.  (DUF ¶ 9.)  According to Mr. Hawkins, the contact person for both audits was Brad Brozaitis, and Mr. Hawkins only met with

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

9

1   Mr. Brozaitis and Mr. DiManno.[11]  (DUF ¶ 21; Doc. No. 92-6 at ¶¶ 15–16.)  Despite some early

2   delays, Mr. Hawkins received all of the necessary documents for the VForce payroll audit by

3   sometime in April 2016.[12]  (Doc. No. 92-6 at ¶¶ 15–16.)

4          Mr. Hawkins explained in his affidavit that for his purposes, he "did not need to make any

5   distinguishment between VForce and Accuire for purposes of evaluating the payroll pertinent to

6

7   [11]  The parties do not clearly articulate what role/position Mr. Brozaitis held with VForce or
    Accuire.  According to the affidavit of Mr. Nobili (VForce's vice president), Mr. Brozaitis was

8   "not a representative[], agent[], or employee[] of VForce at the time of Zurich's audit of the
    VForce Policy"—a fact that Zurich disputes.  (DUF ¶ 22; Doc. No. 102-5 at 5.)  The court notes

9   that the signature block on the emails dated in March and April 2016, which are attached as
    exhibits to Mr. Hawkins's affidavit, reflect "Brad Brozaitis, Operations & Corporate Services,

10  Brad@vforcestaff.com."  (Doc. No. 92-6 at 9–13.)  Further, those emails reflect that Mr. Hawkins
    emailed Mr. Brozaitis a spreadsheet listing outstanding items that were needed for both audits,

11  and Mr. Brozaitis forwarded that email to Mr. Kontokanis (VForce's president), directing his
    attention to the spreadsheet tab for VForce, Inc.  (Id.)  Mr. Kontokanis replied to Mr. Brozaitis,

12  provided answers to Mr. Hawkins's questions, and stated, "I presume the payroll info was already
    requested by you on our behalf based on the emails I was copied to last week.  Let me know if

13  you or Zurich needs anything else."  (Id. at 9–10.)  Mr. Brozaitis forwarded Mr. Kontokanis's
    email to Mr. Hawkins.  (Id. at 9.)  When asked at his deposition about this email and whether Mr.

14  Brozaitis was the person who coordinated the audit materials for VForce, Inc. in that time period,
    Mr. Kontokanis answered:  "I don't recall specifically the situation.  What I remember is that [Mr.

15  Brozaitis] was one of our employees, he went over to the Accuire group, VForce Staffing
    Solutions.  And they were notified of the audit directly.  And he obviously is notifying me that he

16  needs information on our small book of business that we had on that policy, for payroll
    documents for [vendor] Venture.  And we provided it."  (Doc. No. 102-4 at 171.)  Further, Mr.

17  Kontokanis was asked at his deposition if he, Mr. Nobili, or anybody else from VForce, Inc. ever
    contacted the Zurich auditor to say, "wait a minute, don't contact [Mr. Brozaitis] for this

18  information, contact us," and Mr. Kontokanis answered, "I don't recall."  (Id. at 172.)  For his
    part, Mr. Hawkins stated in his affidavit that "[a]t no time during the audit process did Mr.

19  Kontokanis or anyone else complain that I was obtaining information from Mr. Brozaitis for the
    VForce payroll audit."  (Doc. No. 92-6 at ¶ 17.)

20

21

22  [12]  Despite the documentary evidence and deposition testimony referenced in footnote 11 above,
    defendant purports to dispute whether Mr. Kontokanis participated in Zurich's payroll audit of

23  VForce and asserts instead that "Mr. Kontokanis is unaware if anyone from VForce ever
    participated in the audit."  (PUF ¶ 24; DUF ¶ 20.)  As supporting evidence, defendant refers to

24  Mr. Kontokanis's deposition when he was asked, "are you contending that the audit results are
    incorrect?," to which he originally answered, "I'm not contending anything.  I just don't recall the

25  audit.  I don't remember being a part of the audit."  (PUF ¶ 24; DUF ¶ 20; Doc. No. 102-4 at
    172.)  After the deposition, Kontokanis provided a corrected answer:  "I don't know, because

26  VForce didn't participate in the audit and Zurich never sent VForce the audit results.  All I know
    is that the additional premium number is too large, so the audit results must be inaccurate."  (Doc.

27  No. 102-4 at 177.)

28

1    the payroll audit during the VForce policy period" because "[p]rior to Accuire obtaining a

2    separate policy on October 1, 2015, the pertinent payroll for VForce was all of the payroll for the

3    two entities (VForce and Accuire) insured under the VForce policy."  (Doc. No. 92-6 at ¶ 19.)

4    Zurich's audit of the VForce Policy included Accuire's exposure through September 30, 2015.

5    (DUF ¶ 13.)  During Zurich's audit of the VForce Policy, Zurich did not verify or validate which

6    temporary staff employees were paid through Accuire and which temporary staff employees were

7    paid through VForce.  (DUF ¶ 15.)  Rather, during that audit, Zurich reviewed employee-level

8    information of only the internal staff for Accuire.  (DUF ¶ 16.)  As for Zurich's review of class

9    codes during the audit, Zurich reviewed the three class codes that were used by VForce but not all

10   of the approximately 200 class codes listed for both VForce and Accuire.  (DUF ¶ 17.)  Zurich

11   did not review how VForce's experience modification rates were applied to the class codes during

12   the audit of the VForce Policy.  (DUF ¶ 18.)

13          Shortly after an initial audit recap summary was issued on June 21, 2016, VForce's

14   insurance broker (Mr. Forbes) contacted Zurich's audit department and requested that the audit

15   results be revised because the effective dates of the experience modification rating changes during

16   the policy were inaccurate.  (Doc. No. 92-6 at ¶ 21.)  Zurich corrected/revised the audit recap

17   summary accordingly and issued the operative Audit Adjustment of Premium on July 6, 2016,[13]

18   which demanded that VForce pay an additional premium of $612,656.00.  (PUF ¶ 14.)  VForce

19   did not pay any of that amount to Zurich.  (PUF ¶ 16.)  Zurich sent VForce a final invoice dated

20   August 8, 2016, demanding payment of $612,656.00 plus $13.00 in late fees, for a total of

21   $612,669.00.  (Doc. No. 92-3 at ¶ 7.)  On September 27, 2016, Zurich sent a demand letter to

22   VForce, attaching both the final invoice and the Audit Adjustment of Premium, demanding

23   payment of the total amount due.  (*Id.* at ¶ 9.)

24          On July 28, 2018, Zurich filed the complaint initiating this breach-of-contract action

25   against VForce and seeking $612,669.00 in damages.  (Doc. No. 1.)  However, "to simplify

26   

27   ───────────────
     [13]  In stating this undisputed fact, the parties mistakenly state the date of issue as July 6, 2021,
     which appears to a typographical error, as the Audit Adjustment of Premium itself states July 6,
28   2016.  (*See* Doc. No. 92-3 at 363, 371.)

matters for purposes of its complaint and [the pending motion for summary judgment], Zurich is not pursuing the $13.00 late fee charges contained in the final invoice," and thus seeks only $612,656.00 in damages, which is the amount due reflected in the Audit Adjustment of Premium. (PUF ¶ 18; Doc. No. 92-3 at ¶ 10.)

It is undisputed that Zurich's audit of the VForce Policy is not entirely accurate in all respects. (DUF ¶ 8.) In preparation for the filing of the pending motion, Zurich reanalyzed the payroll audit results reflected in the Audit Adjustment of Premium, and determined that there are minor errors in some of the manually input rates of class codes added by endorsements, and that VForce had actually paid a slightly higher deposit premium than noted. (PUF ¶ 17.) Zurich offers as supporting evidence the affidavit of Mike Berrenson, a field technical director in Zurich's premium audit division, who reviewed the Audit Adjustment of Premium. (*Id.*) In his affidavit, Mr. Berrenson states that "[t]he manual input errors regarding class code rates add up to $2,681.00 in additional premium that should have been charged to VForce," but he does not specify which class code rates contained errors or what those errors were in particular. (Doc. No. 92-8 at ¶ 11.) When asked at his deposition if he recalled in this instance what the exact errors were, Mr. Berrenson answered, "No, I do not. I would have no idea." (Doc. No. 102-4 at 58–59.) As for the deposit premium that VForce paid, Zurich's records indicate that VForce made payments totaling $1,314,563.00 but was only given credit for $1,314,498.00—a difference of $65.00. (PUF ¶ 17; Doc. No. 92-8 at ¶ 11.) The net amount of the errors would add $2,616.00 to the amount of additional premium stated as owed by VForce to Zurich in the Audit Adjustment of Premium. (PUF ¶ 17.) However, as noted above, Zurich is seeking only the (admittedly inaccurate) amount of $612,656.00 in damages. (PUF ¶ 18.)

## C.    Procedural Background

As noted above, on July 28, 2018, plaintiff Zurich filed the complaint initiating this action against defendant VForce alleging a single claim for breach of contract, though plaintiff did not promptly serve that complaint. (Doc. No. 1.) Instead, on January 30, 2019, plaintiff filed the operative first amended complaint ("FAC"), asserting the same breach-of-contract claim and substantive allegations against defendant VForce. (Doc. No. 6.) In the FAC, plaintiff also added

defendant Cortech, LLC ("Cortech") and alleged that, on April 23, 2018, "VForce merged with and became the wholly-owned subsidiary of Cortech," and "Cortech became jointly responsible for the liabilities of VForce." (*Id.* at ¶ 13.) On March 11, 2019, defendant Cortech filed an answer to the FAC and denied the merger/subsidiary allegations. (Doc. No. 13.) The next day, defendant VForce filed an answer to the FAC, likewise denying the merger/subsidiary allegations, and asserting 43 affirmative defenses. (Doc. No. 14.)

Also on March 12, 2019, VForce filed a crossclaim against Cortech and a third-party complaint against ten defendants (including Accuire, Mr. DiManno, and Mr. Forbes), asserting claims against them for breach of contract, express indemnity, and equitable indemnity. (Doc. No. 15.) On February 15, 2022, cross-claimant VForce filed the operative second amended crossclaim and third party complaint, naming two additional defendants and bringing six additional claims.[14] (Doc. No. 119.)

On March 2, 2021, plaintiff Zurich filed the pending motion for summary judgment in its favor on its breach-of-contract claim against defendant VForce, or in the alternative, partial summary judgment in its favor on certain of defendant VForce's asserted defenses.[15] (Doc. No. 92.) After receiving extensions of time in which to do so, on May 13, 2021, defendant

---

[14]  Defendants Forbes and Hybrid Financial Group, LLC were not named in the operative third party complaint, consistent with their dismissal with prejudice in June 2020, pursuant to the parties' stipulations. (*See* Doc. Nos. 70–72.) The docket reflects the termination of defendant Forbes, but not defendant Hybrid Financial Group, LLC. Accordingly, the court will direct the Clerk of the Court to update the docket to reflect that defendant Hybrid Financial Group, LLC was terminated as a named defendant in this action on June 23, 2020. (*See* Doc. No. 72.)

[15]  Plaintiff frames its alternative motion as seeking partial summary judgment in its favor on defendant VForce's "asserted defenses"—specifically, defendant VForce's assertions that: (i) VForce owes less than $612,656.00 in additional premiums; (ii) Zurich obtained data for the payroll from persons who were not employees of VForce; (iii) rate changes are not allowed by the Policy; (iv) Zurich is responsible for not issuing a separate policy to Accuire sooner; and (v) Zurich assigned and handled workers' compensation claims that belonged to Accuire employees on VForce's separate policy after the policies were separated. (Doc. No. 92 at 2–3.) However, none of these purported "assertions" are included in the 43 affirmative defenses alleged by defendant VForce in its answer to the FAC. Accordingly, the court will address the arguments raised by the parties with regard to these assertions but only to the extent that they bear on the question of whether plaintiff is entitled to summary judgment in its favor on its breach-of-contract claim.

13

1   VForce filed an opposition to the pending motion for summary judgment.  (Doc. No. 102.)

2   Defendant VForce also concurrently filed a request for judicial notice and objections to the

3   evidence plaintiff submitted in support of the pending motion.  (Doc. Nos. 102-2, 102-3.)  On

4   May 20, 2021, plaintiff filed a reply in support of the pending motion for summary judgment.

5   (Doc. No. 104.)  Plaintiff did not file a response to defendant VForce's request for judicial notice

6   or evidentiary objections and did not otherwise address them in its reply brief.[16]  As noted above,

7   the previously assigned district judge took the pending motion under submission without oral

8   argument.

9                                           **LEGAL STANDARD**

10         Summary judgment is appropriate when the moving party "shows that there is no genuine

11   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

12   Civ. P. 56(a).

13         In summary judgment practice, the moving party "initially bears the burden of proving the

14   absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

15   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

16   may accomplish this by "citing to particular parts of materials in the record, including

17   depositions, documents, electronically stored information, affidavits or declarations, stipulations

18   (including those made for purposes of the motion only), admissions, interrogatory answers, or

19   other materials," or by showing that such materials "do not establish the absence or presence of a

20   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

21   Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

22   "the moving party need only prove that there is an absence of evidence to support the non-moving

23   party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

24   Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery and upon motion, summary

25

26   [16]  The pending motion for summary judgment does not pertain to plaintiff's claims brought
     against defendant Cortech nor to defendant VForce's crossclaims and third party claims.  Indeed,
27   defendant Cortech is not mentioned in either parties' briefs in connection with the pending
     motion.  Accordingly, the court's use of the term "defendant" in the analysis below refers to
28   defendant VForce.

                                                    14

1   judgment should be entered against a party who fails to make a showing sufficient to establish the

2   existence of an element essential to that party's case, and on which that party will bear the burden

3   of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an

4   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

5   *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as

6   whatever is before the district court demonstrates that the standard for the entry of summary

7   judgment . . . is satisfied." *Id.* at 323.

8       If the moving party meets its initial responsibility, the burden then shifts to the opposing

9   party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita*

10  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the

11  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

12  of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

13  admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ.

14  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

15  (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

16  summary judgment."). The opposing party must demonstrate that the fact in contention is

17  material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

18  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

19  non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

20      In the endeavor to establish the existence of a factual dispute, the opposing party need not

21  establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

22  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

23  trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

24  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

25  order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations

26  omitted).

27      "In evaluating the evidence to determine whether there is a genuine issue of fact," the

28  court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

1  *Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's

2  obligation to produce a factual predicate from which the inference may be drawn.  *See Richards*

3  *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th

4  Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

5  simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

6  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

7  'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

8                                                    **ANALYSIS**

9            As a preliminary matter, the court will first address defendant's request for judicial notice

10  and its evidentiary objections.  Then the court will consider whether plaintiff is entitled to

11  summary judgment in its favor as to its breach-of-contract claim brought against defendant

12  VForce, or partial summary judgment in its favor as to certain elements of that claim.

13  **B.        Defendant VForce's Request for Judicial Notice**

14            Pursuant to Federal Rule of Evidence 201(b), a court may "judicially notice a fact that is

15  not subject to reasonable dispute because it:  (1) is generally known within the trial court's

16  territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

17  accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Public records are properly

18  the subject of judicial notice because the contents of such documents contain facts that are not

19  subject to reasonable dispute, and the facts therein "can be accurately and readily determined

20  from sources whose accuracy cannot reasonably be questioned."  *Id.*  Documents that constitute

21  "matters of public record" may be judicially noticed.  *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*,

22  499 F.3d 1048, 1052 (9th Cir. 2007).  However, "[j]ust because the document itself is susceptible

23  to judicial notice does not mean that every assertion of fact within that document is judicially

24  noticeable for its truth."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

25  For this reason, courts should not take judicial notice of a fact contained within a document if that

26  fact "is subject to varying interpretations, and there is reasonable dispute as to what [the

27  document] establishes."  *Reina-Rodriguez v. United States*, 655 F.3d 1182, 1193 (9th Cir. 2011).

28  /////

                                                       16

1    In support of its opposition to the pending motion, defendant requests that the court take

2    judicial notice of two unpublished court orders (exhibits 5, 6) and six pertinent sections of

3    California's workers' compensation rules and regulations (exhibits 7–12).  (Doc. No. 102-3.)  As

4    for the former, judicial notice is not necessary because the court may consider the decisions of

5    other courts, even if those orders are unpublished, and the court will do so here.  *See Phillips v.*

6    *Nat'l City Bank of Ind. First Franklin Div.*, 462 F. App'x 666, *1 n.1 (9th Cir. 2011)[17] ("Judicial

7    notice is not required for the court to consider the cited opinions as matters of law and potentially

8    persuasive precedents.").  As for the latter, the court will take judicial notice of the requested

9    exhibits, which consist of California's rules and regulations pertaining to workers' compensation

10   and the administration of the California Insurance Code, and are thus the proper subject of

11   judicial notice.  *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986),

12   *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991)

13   ("[A] court may take judicial notice of 'records and reports of administrative bodies.'").

14   Accordingly, defendant VForce's request for judicial notice is denied as to exhibits 5 and

15   6, and granted as to exhibits 7–12.

16   **C.     Defendant VForce's Objections to Plaintiff's Evidence**

17   Defendant has filed objections to certain evidence submitted by plaintiff in support of its

18   pending motion.  Specifically, defendant objects to certain statements made in the several

19   affidavits that plaintiff concurrently filed as evidentiary support for its motion for summary

20   judgment (Doc. Nos. 92-3–92-9).  (Doc. No. 102-2.)  Plaintiff did not file a response to

21   defendant's evidentiary objections nor address them in its reply brief.

22   In Objection No. 1, defendant objects to the following statement made by Sheryl Totzke, a

23   legal collections specialist employed by Zurich and assigned to handle the VForce file, as hearsay

24   and lacking personal knowledge:

25           Recently Zurich's counsel was advised by VForce's counsel that
             VForce is contending that some workers compensation claims made
26           by Accuire employees after the separate Accuire policy was issued

27
---
[17] Citation to this unpublished Ninth Circuit decision is appropriate pursuant to Ninth Circuit
28   Rule 36-3.

1

2

3

> are being handled by Zurich as if the claims are against the VForce Policy.  Zurich has asked VForce through counsel for the names of claimants and documentation of this contention, but no evidence has been provided.

4   (Doc. No. 102-2 at 2.)  Because Ms. Totzke does not explain in her affidavit how she is aware of

5   these purported communications between the counsel in this case, defendant's Objection No. 1 is

6   well taken and will be sustained.

7   　　　　In Objection No. 3, defendant objects to the following statement made by Mia

8   Comparetto, a senior account executive and underwriter at World Wide, as hearsay and lacking

9   personal knowledge:  "Shortly before or after the issuance of the VForce policy, World Wide was

10   informed by Mr. Forbes that VForce was the owner of another temporary staffing agency named

11   Accuire, LLC.  VForce requested that Accuire be added as an additional insured to the VForce

12   Policy."  (Doc. No. 102-2 at 3.)  Because Ms. Comparetto does not explain in her affidavit how

13   she became aware of Mr. Forbes's communication or VForce's request, defendant's Objection

14   No. 3 is likewise well taken and will be sustained.  Though the court notes that defendant does

15   not dispute the truth these statements, which are undisputed facts.  (*See* PUF ¶ 9.)

16   　　　　In Objection Nos. 4 and 5, defendant objects to the following statements made by Ms.

17   Comparetto:  "World Wide issued Endorsement No. 3 to VForce, which added Accuire as an

18   additional insured to the VForce Policy," and "[e]ffective with the issuance of the Accuire Policy,

19   World Wide issued Endorsement No. 23 to the VForce Policy removing Accuire as an additional

20   insured."  (Doc. No. 102-2 at 4.)  In making its objection defendant merely refers to Rule 1002 of

21   the Federal Rules of Evidence, which provides that an original writing is required in order to

22   prove its contents.  Fed. R. Evid. 1002.  However, the originals of Endorsement Nos. 3 and 23

23   have been provided to the court on summary judgment as evidence.  (Doc. No. 92-3 at 68, 321.)

24   For this reason, defendant's Objection Nos. 4 and 5 are not well founded and will be overruled.

25   　　　　In Objection No. 7, defendant objects to the statement made by Mr. Thompson that "Mr.

26   Forbes relayed VForce's acceptance of the VForce proposal" as hearsay.  (Doc. No. 102-2 at 5.)

27   Because this statement does not specify to whom Mr. Forbes relayed VForce's acceptance, and in

28   particular whether Mr. Forbes relayed such acceptance to Mr. Thompson directly, defendant's

1    hearsay objection is well taken.  Thus, defendant's Objection No. 7 will be sustained.  Though,

2    again, the court notes that defendant does not dispute the underlying fact that VForce accepted the

3    VForce policy.  (*See* PUF ¶ 3.)

4           In Objection No. 8, defendant objects that Mr. Thompson lacked personal knowledge for

5    his statement regarding Ms. Comparetto's follow-up efforts with Mr. Forbes to obtain the

6    documentation needed for underwriting of a separate policy for Accuire.  (Doc. No. 102-2 at 5.)

7    Because Mr. Thompson did not describe how he was personally aware of Ms. Comparetto's

8    efforts in this regard, defendant's Objection No. 8 will be sustained.  Though, the court notes that

9    defendant's objection in this regard appears to be disingenuous because defendant itself cites the

10   objected-to statement as evidence supporting its response to one of plaintiff's undisputed facts.

11   (*See* PUF ¶ 25.)

12          In Objection No. 12, defendant objects that Mr. Hawkins, Zurich's premium audit director

13   who performed the payroll audit on the VForce Policy, lacks personal knowledge to make the

14   statement that, "[a]t no time during the audit process did Mr. Kontokanis or anyone else complain

15   that I was obtaining information from Mr. Brozaitis for the VForce payroll audit."  (Doc. No.

16   102-2 at 7.)  The court does not agree with this contention.  Reading this statement in context

17   with the preceding paragraphs in his affidavit—which describe and attach as an exhibit his emails

18   with Mr. Brozaitis, including emails in which Mr. Kontokanis was copied and replied to provide

19   the requested information—the court finds that Mr. Hawkins has sufficient personal knowledge to

20   support the admissibility of this statement as evidence on summary judgment.  Thus, defendant's

21   Objection No. 12 will be overruled.

22          In Objection No. 13, defendant objects to Mr. Hawkins's statements regarding VForce's

23   insurance broker contacting his department to request a revised payroll audit and his department

24   in turn contacting Zurich's technical operations center to issue a revised audit dated July 6, 2016,

25   which it did.  (Doc. No. 102-2 at 7.)  Defendant's objection based on lack of personal knowledge

26   is unavailing because Mr. Hawkins explained in his affidavit that he is the audit department

27   director and was the auditor on the VForce policy, and that he personally had submitted the

28   information for the issuance of the payroll audit results to Zurich's technical operations center.  In

                                                 19

addition, defendant's objection based on hearsay is unavailing because Mr. Hawkins would be able to testify and present this evidence "in an admissible form at trial." *Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1157 (S.D. Cal. 2022); s*ee also Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary judgment stage, [courts] do not focus on the admissibility of the evidence's form," courts "instead focus on the admissibility of its contents.") (citation omitted).  Further, it may well be that plaintiff does not offer Mr. Hawkins's statement for the truth of the matter asserted—i.e., that VForce requested a revised audit—in which case his statement would not be hearsay.  For all of these reasons, defendant's Objection No. 13 will be overruled.

In Objection Nos. 19, 20, and 21, defendant objects to the excerpts of three deposition transcripts attached as exhibits to the affidavit of plaintiff's counsel, Lincoln V. Horton, on the grounds that they are inadmissible because counsel did not include the reporter's certification as required to properly authenticate those transcripts.  (Doc. No. 102-2 at 10–11.)  Defendant's objections in this regard are well taken.  The Ninth Circuit has made clear that "[a] deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent."  *Orr*, 285 F.3d at 774.  "It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a 'true and correct copy.'  Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition."  *Id.* (internal citations omitted).  While courts routinely permit consideration of deposition transcripts that are not authenticated with the moving papers if this failure is cured and the reporter's certification is provided along with the reply papers, *see Bouissey v. Swift Transp. Co.*, No. 2:19-cv-03203-VAP-KK, 2022 WL 16957830, at *3 (C.D. Cal. Sept. 27, 2022), here, for some inexplicable reason, plaintiff did not bother filing the reporter's certifications with its reply brief to remedy this failure after it was pointed out by defendant.  Accordingly, defendant's Objections Nos. 19–21 will be sustained.

/////

1    Finally, having reviewed defendant's Objection Nos. 2, 6, 9–11, and 14–18,[18] the court

2    has determined that it need not address these objections because the objected-to statements are

3    not relevant to the pending motion for summary judgment, and the court does not rely upon those

4    statements as evidence in resolving the pending motion.  *See Starz Ent., LLC v. Buena Vista*

5    *Television, Inc.*, No. 07-cv-1895-VBF-PJW, 2008 WL 11338633, at *4 (C.D. Cal. Sept. 18, 2008)

6    ("The evidence at issue is not pertinent to the Court's analysis in this Motion and, therefore, it

7    need not address [the plaintiff's] objection."); *Aguaristi v. Cnty. of Merced*, No. 1:18-cv-01053-

8    DAD-EPG, 2022 WL 2392621, at *9 (E.D. Cal. July 1, 2022) (declining to address evidentiary

9    objections to a declaration because the court did not rely on that declaration in resolving the

10   motion for summary judgment).

11   In sum, defendant's Objections Nos. 1, 3, 7, 8, 19, 20, and 21 are sustained, and

12   defendant's Objections Nos. 4, 5, 12, and 13 are overruled.

13   **D.     Plaintiff's Motion for Summary Judgment**

14   To prevail on a claim for breach of contract under California law, a plaintiff must show:

15   (1) the existence of a contract; (2) plaintiff's performance under the contract or excuse for

16   nonperformance; (3) defendant's breach; and (4) resulting damages to the plaintiff.  *Oasis W.*

17   *Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

18   In the pending motion, plaintiff argues that it has provided "the evidence necessary to

19   prove-up all of the elements required" to prevail on its sole claim against defendant for breaching

20   the Policy (a workers' compensation insurance contract) by failing to pay the additional insurance

21   premiums it owes based on the results of the payroll audit, as required by the terms of the Policy.

22   (Doc. No. 92-1 at 12–13.)  As to the first element, plaintiff points to the Policy (specifically,

23   Zurich workers' compensation policy No. WC 5714367-00 that was issued to VForce for the

24   policy period December 15, 2014 to December 15, 2015) and the Policy's endorsements to

25   establish the existence of a contract.  (*Id.* at 13.)  As to the second element, plaintiff points to the

26

---

[18]  Defendant made an error in numbering its objections, beginning with its 17th objection (which
27   is mistakenly numbered 15) and continuing through its 21st and final objection (which is
mistakenly numbered 19).  In referencing defendant's objections in this order, the court applies
28   the corrected sequential numbering.

1   undisputed fact that it performed under that contract by providing defendant and Accuire with

2   workers' compensation insurance during the policy period pursuant to the Policy.  (*Id.*)  As to the

3   third element, to establish defendant's breach of the contract, plaintiff points to the undisputed

4   fact that defendant has not paid any of the additional premiums due following the payroll audit as

5   required under the Policy.  (*Id.*)  As to the fourth and final element, plaintiff points to the payroll

6   audit results, which reflect additional premium owed in the amount of $612,656.00, as its

7   damages resulting from defendant's breach of the Policy.  (*Id.*)

8         In its opposition to the pending motion, defendant argues that plaintiff's motion should be

9   denied because "there are genuine issues of material fact regarding:  (1) the validity of the

10  Policy's endorsements, most notably illegally adding Accuire to the Policy; (2) the accuracy of

11  Zurich's internal audit; and (3) Zurich's delay in removing Accuire from VForce's policy."  (Doc.

12  No. 102 at 6.)

13        In its reply, plaintiff offers arguments and supporting evidence to rebut defendant's

14  contentions and emphasizes that the evidence defendant has submitted is insufficient to establish

15  a genuine dispute as to any material fact.  (Doc. No. 104.)

16        The court will address in turn the parties' respective arguments as to the first, third, and

17  fourth elements of plaintiff's breach of contract claim.[19]  For the reasons explained below, the

18  court finds that, based on the evidence before the court on summary judgment, plaintiff has

19  established that the Policy exists and is valid, and defendant breached the Policy by not paying

20  additional premiums due under the Policy, but the amount of plaintiff's damages is subject to a

21  genuine dispute of material fact.  Thus, the court will grant partial summary judgment in favor of

22  plaintiff only as to the first three elements of its breach of contract claim.

23        1.    Existence of a Contract – Whether the Policy Endorsements are Valid

24        As noted above, defendant does not dispute the existence of the Policy, including its

25  endorsements, but rather argues that the endorsements are "illegal, void, and unenforceable" for a

26

27  ───────────────

    [19]  Defendant does not contest that plaintiff has satisfied the second element, and the undisputed
28  facts establish that plaintiff performed under the contract by providing workers' compensation
    insurance during the policy period.

                                          22

1    few reasons, none of which are persuasive.  (Doc. No. 102 at 11.)  First, defendant contends that

2    because endorsements must be filed with the WCIRB to be valid under California Insurance Code

3    § 11658, "the Policy's endorsements are void and unenforceable because they were not filed with

4    the WCIRB."  (*Id.*)

5          Defendant is correct in asserting that § 11658 requires insurers to file their endorsements

6    with the WCIRB.  *See Am. Zurich Ins. Co. v. Country Villa Serv. Corp.*, No. 2:14-cv-03779-

7    RSWL, 2015 WL 4163008, at *16–17 (C.D. Cal. July 9, 2015) (concluding that policy

8    endorsements were void and unenforceable where the insurance company admitted that it had not

9    filed the endorsements with the WCIRB as required by § 11658); *see also Nielsen Contracting,*

10    *Inc. v. Applied Underwriters, Inc.*, 22 Cal. App. 5th 1096, 1113–14 (2018) (holding that "[t]he

11    court properly found these provisions were void and unenforceable because defendants had not

12    filed these provisions with the Insurance Commissioner as required by § 11658").  However, as

13    noted above in footnote 6, defendant has not offered any evidence to support its conclusory

14    assertion that the Policy endorsements were not filed with the WCIRB.  In contrast, plaintiff has

15    offered clear evidence—specifically, affidavits from its programs underwriter, its statistical

16    analyst, and World Wide's underwriting supervisor—all of whom confirmed that the Policy

17    endorsements were filed with the WCIRB by automatic uploads via a direct link from Zurich to

18    WCIRB through Zurich's policy writing system.  (*See* Doc. Nos. 104-2 at ¶ 8; 104-3 at ¶¶ 2–3;

19    104-4 at ¶¶ 3–4.)  Thus, defendant's wholly unsupported argument that the endorsements are void

20    and unenforceable based on plaintiff's purported non-compliance with § 11658's filing

21    requirement fails.

22          Second, defendant contends that Endorsement No. 3 (adding Accuire to the VForce

23    Policy) is void and unenforceable because World Wide "simply added 'Accuire' as an 'entity

24    name' and ignored California rules for adding an additional named insured to a workers'

25    compensation policy."  (Doc. No. 102 at 14.)  Notably, defendant does not cite to or discuss any

26    particular California "rule" that it contends World Wide ignored when adding Accuire to the

27    VForce Policy at VForce's request.  Rather, defendant asserts, without any context, that "'each

28    name must be reported on a separate name record' and with a code if the entity is being ensured

1    under common ownership, and the DBA must be in parenthesis."  (*Id.*)  In this regard, defendant

2    merely cites generally to Exhibit 7 of its request for judicial notice, which defendant described as

3    "California Workers' Compensation Uniform Statistical Reporting Plan–1995, Title 10,

4    California Code of Regulations Section 2318.6, Part 2 Policy Reporting Requirements, Section III

5    Additional Electronic Reporting Requirements."  (*See* Doc. Nos. 102 at 14; 102-3; 102-4 at 130.)

6    That exhibit contains three pages of text listing various requirements for electronic reporting,

7    such as "header record information" directing the filer to select the numeric code that best

8    represents the entity (e.g., individual, partnership, corporation, etc.), and "name record

9    information" directing the filer on the particular requirements for stating the name the entity (e.g.,

10   for individuals, the proper sequence of last name, first name, middle initial, and the proper

11   placements of commas; and for corporations, stating the name exactly as shown in the articles of

12   incorporation).  (Doc. No. 102-4 at 132–134.)  Defendant does not direct the court's attention to

13   any particular requirement or provision.  It is thus unclear what precisely defendant is contending

14   plaintiff failed to do with regard to these electronic reporting requirements and what evidence

15   defendant is relying on to establish such a purported failure.  In its reply, plaintiff asserts that

16   defendant "makes several arguments that are poorly developed, lacking evidence, and lacking

17   legal authority that the remedy of some alleged technically error would be to invalidate the

18   addition of Accuire as an additional insured that VForce, itself, requested."  (Doc. No. 104 at 5.)

19   The court agrees with plaintiff's observation.

20          Moreover, in its opposition brief, defendant selectively and inaccurately quotes the text of

21   Endorsement No. 3 in stating that the endorsement "describes the change to the Policy as adding

22   'VForce Staffing Solutions' as a 'DBA name' to 'legal entity.'"  (Doc. No. 102 at 14.)  But the

23   text of that portion of Endorsement No. 3 actually states:

24                    THE FOLLOWING DBA NAME HAS BEEN ADDED TO LEGAL
                     ENTITY:  **ACCUIRE, LLC**:  VFORCE STAFFING SOLUTIONS
25

26   (Doc. No. 92-3 at 68) (emphasis added).  That is, defendant omitted "Accuire, LLC" from its

27   quoted excerpt, which further discredits defendant's contention that Accuire LLC was not added

28   as an additional insured on the Policy.

24

1    Finally, as plaintiff points out in its reply, there is no evidence before the court on

2    summary judgment that the WCIRB ever rejected or challenged Endorsement No. 3 adding

3    Accuire as an additional insured on the Policy.  (Doc. No. 104 at 7.)  To the contrary, defendant

4    points to the WCIRB-created Workers' Compensation Experience Rating Forms, attached as

5    exhibits to the affidavit of Mr. Buck, Zurich's programs underwriter, which reflect that after the

6    issuance of Endorsement No. 3, the WCIRB began to refer to both VForce and Accuire as the

7    insureds on the VForce Policy.  (*Id.*) (citing Doc. Nos. 92-7 at 11, 13; 104-2 at ¶ 12).  Further, to

8    support its assertion that Accuire was not added to the VForce Policy, defendant relies on the two

9    criticism letters that Zurich received from the WCIRB regarding a "Policy Audit Error Query,"

10   which defendant argues constitute evidence that according to the WCIRB, Accuire had not been

11   added to the VForce Policy.  (Doc. No. 102 at 14–15.)  The only evidence that defendant offers to

12   support this argument is the deposition testimony of Mr. Thompson, World Wide's president, but

13   that testimony does not substantiate defendant's interpretation of the letters.  (*Id.*)  At his

14   deposition Mr. Thompson was asked what he "glean[ed]" from the letters and what he took them

15   to mean, and he answered by quoting the letter directly, "[t]he following name was not on prior

16   coverage for this policyholder about the criticism letters," which he took to mean that Accuire

17   was not listed on the VForce Policy.  (Doc. No. 102-4 at 76.)  He further answered as follows:

18         There was some confusion whether -- I guess when they did an audit,
           I don't know what the date of this policy was.  September 15.  So
19         they must have done an audit and realized that Accuire was not
           named on there or was named on there, and maybe there was some
20         other incident.  I don't really know why it would be that way, but.

21         [Question:]  When you say "they" did an audit, who are you referring
           to?
22
           Well, it says here "The WCIRB's audit of the referenced policy
23         detected the following data conditions.  The following name was not
           on prior coverage for this policyholder."  So to me that means that
24         Accuire wasn't listed somewhere.

25   (Doc. No. 102-4 at 76–77.)  This testimony reflects Mr. Thompson's speculation as to what these

26   criticism letters mean, in his view, and does not constitute evidence of the WCIRB's view as to

27   the addition of Accuire on the VForce Policy.  Indeed, it is not clear on what basis Mr. Thompson

28   arrived at this view—aside from mere speculation—since a few moments earlier in his

25

1    deposition, Mr. Thompson had explained that World Wide never submits information to the

2    WCIRB and that it is *Zurich* who does so.  (Doc. No. 102-4 at 73.)  Whereas, Zurich's programs

3    underwriter, Mr. Buck, explained in his affidavit that the two letters Zurich received from the

4    WCIRB actually acknowledge the addition of Accuire "as an insured to the VForce policy, and

5    request information about Accuire's past policy history, given that Accuire was not previously on

6    VForce's workers compensation coverage as a combinable entity."  (Doc. No. 104-2 at ¶ 13.)

7    More importantly, later in Mr. Thompson's deposition testimony, he offered a speculative reason

8    for the criticism ("crit") letters that differed from his earlier testimony and was actually consistent

9    with Mr. Buck's explanation.  Specifically, when later shown a copy of Endorsement No. 3, Mr.

10   Thompson was asked if the endorsement was submitted to the WCIRB, to which he answered that

11   he was sure the endorsement was submitted at some point by Zurich, and he provided the

12   following explanation:

13
            They wouldn't have sent a crit.  They wouldn't have known about it
14          at some point unless – or they wouldn't have sent a crit out if they
            didn't get some information on it so.  This is probably wondering –
15          now that you are showing me this, what this probably means is that
            there was not a listing of Accuire having workers' comp in place until
16          this happened so. . . .

17          They might have had some kind of lapse there, so they were
            wondering where was the insurance.  I'm guessing.  I'm just guessing
18          because that would make sense.

19   (Doc. No. 102-4 at 80.)  In light of Mr. Thompson's full deposition testimony, when considered

20   in context, the court finds that defendant's reliance on that testimony is insufficient to support its

21   assertion that the WCIRB criticism letters reflect that Accuire had not been added as an additional

22   insured on the VForce Policy.  Accordingly, defendant has failed to present evidence establishing

23   a disputed issue of material fact in this regard.

24          In sum, the court finds that the evidence before the court on summary judgment

25   establishes the existence of a contract (i.e., the Policy and its endorsements), and the court rejects

26   defendant's unsupported arguments that the Policy's endorsements are illegal, void, and

27   unenforceable.  Defendant has not shown that there is a genuine dispute of material fact as to the

28   validity of Endorsement No. 3 adding Accuire as an additional insured on the VForce Policy.

                                              26

2.      Whether Defendant Breached the Policy by Failing to Pay An Additional Premium

In opposing the pending motion, defendant does not advance any arguments regarding its

obligation under the Policy to pay an additional premium following a "true-up" payroll audit.

Defendant challenges the validity of the two Policy endorsements issued for ex mod rating

increases and the several other endorsements issued to reflect the addition of class codes during

the policy period, which are used in calculating the additional premium due.  (Doc. No. 102 at

15–16.)  However, defendant's challenge in this regard is predicated solely on Zurich's purported

failure to file the endorsements with WCIRB—an argument the court has already rejected for the

reasons explained above.  That is, defendant does not offer any argument that the ex mod rate

increases or class code additions were in any way erroneous, inapplicable, or otherwise

improperly used in calculating the additional premium due.  To be sure, defendant disputes the

accuracy of the payroll audit results indicating additional premiums due in the amount of

$612,656.00, but defendant does not state what amount it calculates the accurate figure to be or

provide any evidence to substantiate its undisclosed calculation, nor does defendant offer any

evidence that it has already made a payment to Zurich in that amount (or any amount at all).  In

other words, defendant effectively concedes that it has not paid *any* amount of additional

premiums, despite its obligation under the Policy to do so.  Although the amount of damages here

is in dispute, as discussed below, defendant's breach of the Policy by failing to pay additional

premiums as required under the Policy is entirely undisputed.

Thus, the court finds that based on the evidence before it on summary judgment, plaintiff

has established defendant's breach of the Policy.  There is no genuine dispute of material fact that

defendant has not paid any amount in additional premiums due under the Policy, which

constitutes a breach of the Policy.

3.      Whether Plaintiff has Established Damages in the Amount Demanded

Defendant argues that "a factual determination regarding the accuracy of Zurich's audit is

necessary," which precludes the granting of summary judgment in defendant's favor on its breach

of contract claim.  (Doc. No. 102 at 16.)  The court agrees with defendant that the amount of

/////

1    damages is subject to a genuine dispute of material fact, though not for all of the reasons

2    advanced by defendant.

3         Defendant first argues that the audit results are inaccurate because Zurich did not

4    distinguish between VForce's payroll and Accuire's payroll during the entire policy period, and

5    "Mr. Hawkins did not make any distinguishment between VForce and Accuire for purposes of

6    evaluating the payroll pertinent to the payroll audit during the VForce policy period." (Doc. No.

7    102 at 16, 17.)  Whether the underlying purported fact (that Zurich did not distinguish the two

8    entities for the VForce payroll audit) is true or not has not been established by the evidence

9    presented by the parties on summary judgment.  But this apparent factual dispute itself does not

10   preclude the granting of summary judgment because defendant contends that "this distinction is

11   essential, given that any payroll attributed to Accuire through the Policy's endorsements are not

12   valid and enforceable."  (*Id.* at 17.)  Yet the court has already concluded that the Policy's

13   endorsements are valid, suggesting that the distinction between VForce's and Accuire's payroll is

14   not essential in assessing the accuracy of the audit.

15        In its reply, plaintiff rebuts defendant's challenge to the accuracy of its audit results by

16   first asserting that the challenge is baseless "because the results are based on the payroll numbers

17   and class codes supplied to the Zurich auditor from VForce and Accuire's (and their [professional

18   employer organization] PEO's) own payroll records."  (Doc. No. 104 at 7–8.)  However,

19   defendant argues that VForce did not participate in the audit, relying on the deposition testimony

20   of Mr. Kontokanis.  (Doc. No. 102 at 19–20.)  As discussed at length in footnotes 11 and 12

21   above, plaintiff has offered substantial evidence to show that VForce did provide documents

22   needed for the audit, and despite this evidence, Mr. Kontokanis maintains otherwise.  As the court

23   does not weigh the evidence or determine a witness's credibility at the summary judgment

24   stage—no matter how weighty or how uncredible—the court cannot determine based on the

25   evidence before it on summary judgment whether VForce (through Mr. Kontokanis or Mr.

26   Brozaitis, or someone else) assisted in the payroll audit by providing VForce's documents as

27   requested by Mr. Hawkins.

28   /////

28

1    Defendant next argues that Zurich did not verify or validate the source information used

2    during its payroll audit.  (Doc. No. 102 at 18.)  In particular, in auditing the VForce payroll and

3    reviewing that audit, Zurich's auditors (both Mr. Hawkins and Mr. Berrenson) did not verify class

4    codes, ex mod ratings, or which employees were paid by Accuire or VForce.  (*Id.*)  Defendant

5    emphasizes that even Mr. Berrenson admitted that there were errors in the audit and during his

6    deposition, he stated that he does not recall the errors and he "would have no idea" what those

7    errors were specifically.  (*Id.* at 19) (citing Doc. No. 102-4 at 58–59).  In its reply, plaintiff

8    acknowledges that Zurich made some small errors but discounts the significance of those

9    mistakes by noting that correcting the errors would result in defendant owing $2,616.00 more

10   than the $612,656.00 it is seeking in damages.  (Doc. No. 104 at 8.)  According to plaintiff, its

11   audit results may not be correct, but they are sufficient evidence that defendant owes "at least"

12   $612,656.00, and plaintiff is willing to accept that lesser amount.  (*Id.* at 8–9.)  The court is not so

13   readily persuaded that such "minor" errors are too insignificant to call into question the overall

14   accuracy of the audit results, particularly given that Mr. Berrenson's audit review in preparation

15   for the pending motion involved reviewing only the audit recap summary and the information

16   provided by Mr. Hawkins; Mr. Berrenson did not review any native document from VForce or

17   Accuire or any class codes or ex mod rating information to verify accuracy.  Accordingly, the

18   court finds that plaintiff has not established that the $612,656.00 amount of additional premium it

19   seeks in damages is an accurate figure, let alone an undisputed amount.  *See Zurich Am. Ins. Co.*

20   *v. UGS Priv. Sec., Inc.*, No. 22-cv-1163-GW-EX, 2023 WL 3565063, at *5 (C.D. Cal. Jan. 20,

21   2023) (denying insurance companies' motion for summary judgment on a breach of contract

22   claim because they "insufficiently substantiated the provided audit report calculations," "have not

23   provided this Court with the necessary documentation or data to support that [defendant's]

24   reported payroll increased for both policy years," and have "insufficiently describe[d] the source

25   of the data they used in the audit.")

26   For these reasons, the court will grant partial summary judgment in favor of plaintiff only

27   as to the first, second, and third elements of its breach of contract claim, and will deny partial

28   /////

1  summary judgment on the issue of the amount of damages, which is subject to a genuine factual

2  dispute.[20]

3                                        **CONCLUSION**

4          For the reasons explained above,

5          1.      Defendant VForce, Inc.'s request for judicial notice (Doc. No. 27-1) is granted as

6                  to exhibits 7–12 and denied as to exhibits 5 and 6;

7          2.      Plaintiff's motion for summary judgment, or in the alternative, partial summary

8                  judgment, (Doc. No. 92) is granted, in part and denied in part as follows:

9                  a.      Plaintiff's motion for partial summary judgment in its favor as to the first,

10                         second, and third elements of its breach of contract claim against defendant

11                         VForce, Inc., is granted; and

12                 b.      Plaintiff's motion for partial summary judgment in its favor as to the fourth

13                         element of damages on its breach of contract claim against defendant

14                         VForce, Inc., is denied; and

15  /////

16  /////

17  /////

18  /////

19  /////

20  /////

21

22  [20] Defendant advances one additional argument, albeit without any evidentiary support or citation
    to legal authority—that Zurich delayed removing Accuire from VForce's Policy until mid-
23  September 2015 even though the ownership change occurred in May 2015.  (Doc. No. 102 at 20.)
    However, defendant fails to provide any evidence that VForce took any steps with Zurich to have
24  Accuire removed from its policy any sooner than it did in September 2015, or that Zurich had the
    documents it needed to propose a separate policy for Accuire and remove Accuire from VForce's
25  policy any sooner than it did in September 2015.  To the extent VForce takes issue with Accuire
    for not providing the documents that Zurich requested sooner, or contends that Accuire should be
26  liable to reimburse VForce for the additional premium attributable to the Accuire payroll for the
    period after the change of ownership in May 2015, those issues are the subject of VForce's third-
27  party complaint against Accuire.  Those issues do not preclude the granting of partial summary
    judgment in favor of Zurich on Zurich's breach of contract claim brought against VForce.

28

                                              30

1        3.      The Clerk of the Court is directed to update the docket to reflect that defendant

2                Hybrid Financial Group, LLC was terminated as a named defendant in this action

3                on June 23, 2020.  (*See* Doc. No. 72.)

4       IT IS SO ORDERED.

5

6    Dated:   **February 2, 2024**                          

                                    DALE A. DROZD

7                                        UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28